Counsel, before you begin, I do notice that we have two counsel listed. Are you splitting your time? Yes, we are, Your Honor. And you've agreed as to how you're doing it? You understand that the 20 minutes on the clock is the total time for both counsel? Yes. Okay. Indeed. Thank you, Your Honor. Good morning. I'm James Harrison from Renshaw, Johansson & Purcell. On behalf of intervenors Daphne Fong and Chris Kelly, if it pleases the Court, I'd like to address the threshold question of whether Prop 35 is subject to First Amendment scrutiny, and even if it is, why it's narrowly tailored. Deputy Attorney General Wilson will address how Prop 35 advances the State's significant interests, and he'll respond to the District Court's concerns regarding public disclosure and monitoring. And, of course, we're both happy to answer any questions the Court may have. I'd like to take 8 minutes and defer the rest of the time to Mr. Wilson and to appellants for rebuttal. Prop 35 imposes a registration requirement. It doesn't regulate speech. So let me just take the Court through a couple of examples of that. It doesn't prevent sex offenders from speaking online, even anonymously. It doesn't require registration as a condition of speaking. It doesn't require sex offenders to disclose their identity when they speak. It doesn't suppress a particular viewpoint or any viewpoint at all. It doesn't restrict the types of websites that sex offenders can use to communicate. It doesn't restrict the number of identifiers they can use. And it doesn't require sex offenders to provide their passwords to law enforcement. Internet identifiers are, in today's world, essentially a virtual mask. The case of the Church of American Knights, the Second Circuit ruled that a New York City statute that prohibited wearing of masks during a public demonstration didn't implicate the First Amendment because the Court concluded that the First Amendment does not entail the right to conceal one's appearance in a public demonstration. The same is true here. To the extent that Prop 35 affects expressive activity at all, it's no different than the requirement that sex offenders provide law enforcement with their aliases and other identifying information. But unlike that other registration information, internet identifiers are not made available on the state's Megan's Law website. And the information may only be made available to the public if a law enforcement agency determines, based on an individualized determination related to a specific registrant, that disclosure is necessary to prevent or investigate an online sex crime. So today, any member of the public, except registered sex offenders themselves, can go on the state's Megan's Law website and search by county, city, zip code, even street address, and determine who among their neighbors is a registered sex offender, including their names, aliases, photograph, physical description, distinguishing marks and tattoos, and in some cases, even street addresses. So when that registered sex offender walks from his home to a public park to make a, quote, unquote, to identify him as the source of those communications. Let's take Margaret McIntyre as an example. The Court is well familiar with the U.S. Supreme Court case in McIntyre. If Margaret McIntyre were a registered sex offender in California, she'd have an easier time preserving her anonymity by emailing that leaflet or posting it on an Internet website than she would by going to the school and delivering it in person. As Mr. Wilson will explain in greater detail, it's highly unlikely that the public would be able to identify Mrs. McIntyre as the source of the leaflet, because it's highly unlikely that distribution of that leaflet would be necessary to investigate or solve an online sex crime. Unlike the physical world where community notification that a registered sex offender lives in the neighborhood may serve law enforcement's goal of putting neighbors on notice of the person's presence, the Internet doesn't have any geographic boundaries. In fact, there are several cases in the record which reflect the fact that Internet, excuse me, the fact that sex offenders sometimes travel from state to state to meet their victims. So it's highly unlikely that public dissemination would serve the law enforcement goal of preventing or investigating an online sex crime. Interveners don't contest that online speech stands on the same footing as other speech. But plaintiffs are seeking to elevate online speech by registered sex offenders on the Internet above that afforded anonymous speech in the physical world. When a sex offender meets a child at the mall or a park, it happens in plain view. But when a sex offender uses the Internet to groom a child, it happens out of sight of law enforcement. And the record reflects that sex offenders have migrated from shopping malls and parks to chat rooms, gaming sites, and other Web sites. I'd like to briefly address why even if the Court believes that Prop. 35 triggers First Amendment scrutiny, the district court erred by finding it was not narrowly tailored. The district court, by the way, had no problem recognizing that the State had a legitimate interest in collecting Internet identifiers. But the district court was concerned that the law applied to too many offenders in two different respects. The district court suggested that the State could use static 99 to assess the risks of sex offenders and to only require those who are most likely to be recidivists to file. Well, the problem with that is twofold. One, the U.S. Supreme Court rejected that same argument not once but twice in the context of sex offender registration, both in Smith v. Doe as well as Connecticut v. Doe. In both of those cases, in the context of the due process clause and the ex post facto clause, the Supreme Court concluded that an individualized prediction of future dangerousness was not required for mere registration. Am I correct that this requirement applies to all sex offenders regardless of whether they have used the Internet or not? You are correct, Your Honor. And if I may address that point specifically, because that was one of the other concerns expressed by the district court. California has been collecting sex offender registration information since 1947. The Internet was commercialized in 1995. In this particular case, the plaintiffs, Doe and Rowe, were convicted of their offenses in 1986 and 1992. The fact that a registered sex offender didn't use the Internet to commit his first crime or to facilitate it doesn't mean that he might not use the Internet in the future. In fact, the record reflects that. That's true of all of us. I mean, that we might, just because we haven't been sex criminals in the past, we may not be in the future. I don't see how that's a, that the sex criminal itself is a predictor of use of the Internet. Well, let me just cite one fact that's in the record to the Court. Between 2000 and 2006, there was, according to studies, a decline in sex offenses committed against children. At the same time, there was an increase in the use of the Internet to commit sex crimes. A plaintiff's expert explains that that distinction may arise from the fact that sex   I don't see how that's a predictor of use of the Internet. That's true. That's true of shoppers. Excuse me, Your Honor? That's true of shoppers, too. It is true, Your Honor, of shoppers. But remember, we're just asking for registration information here. We're just asking for an Internet identifier, which is really simply an investigatory tool that law enforcement can use if a parent comes to the police and says, my daughter ran away. She's been corresponding with this person on the Internet. She may have gone to meet him. If law enforcement has that identifier or e-mail address, it can quickly run a search and determine whether it belongs to a registered sex offender. And if it does, law enforcement has a head start in their investigation. So while I understand that not every sex offender will be a recidivist and not every sex offender will use the Internet to facilitate their crime, this burden on sex offenders is very low compared to the benefit to law enforcement and the public at large in protecting themselves against predators. I've taken too much time. Thank you, Your Honor. Thank you. May it please the Court. Robert Wilson for the Attorney General of California. I would like to reserve three minutes of time for rebuttal. I would begin by just simply saying there's no getting around the fact that California has been collecting this information from tens of thousands of registrants for a year and a half with none of the problems that plaintiffs complained about in the Court below. And if we think about it, California is very difficult to quantify chilling, isn't it? That's true, Your Honor. And so if we focus on some things, though, that we know of for sure, number one, there have been no prosecutions that we know of. Number two, no one has complained to the Department of Justice that they don't understand what they're supposed to be providing. When you say no prosecutions, you mean? No prosecutions for failing to register or provide your Internet identifiers. One of the concerns below was, gee, they're going to all be prosecuted if they forget to give us an Internet identifier. It hasn't happened. It's just that the law is utterly toothless. And there's a lot of inferences that can be drawn from that. One is that California doesn't care. The other is that there weren't any violations. And the other is that it's the law is utterly toothless. And those are pretty different inferences to be drawn from that statistic. That's right, Your Honor. But we would think that if there were some problem of prosecution, we would have seen  But there were no prosecutions. There also were no widespread distributions of Internet identifiers to the public, which is another concern of the Court below. And we think there's good I'm sorry. The law went into effect when? June 2011. This lawsuit was filed in November of 2012. So we had about 18 months of collecting. The collecting is on a yearly basis based on birthday. There are approximately 100,000 registrants in California. We would have gone through an entire cycle at least one, one and a half times. We think there's a good reason for an explanation of why none of these effects seem to be occurring. And it's something that none of the courts in the United States has ever done, which is unpack what this statute is supposed to do or a statute like it. Here's what case does and without it. Without case, law enforcement's required Let's assume a little girl goes missing and foul play is suspected. Without the case information, law enforcement is required to go through a two or a three-step warrant-type process, progressively gathering information about who this person, who the suspect might be and where they are. The name of the game is to find this person as fast as humanly possible. Without case, this process can take a week or two weeks or three weeks or more. At the end of the day, when we get all of the warrants satisfied, all it allows law enforcement to do is come back to their office, open their file drawer, pull out a file on somebody they already know and look at the information we already have. We have to right now go through that entire process just to be able to access the information we already have because what case does is it provides a link between whoever this person is on the Internet with information we already have about them in our files. So without case, we've got to go through this warrant process. With case, all that will allow us to do is to say, okay, this Internet identifier is identified with this registered sex offender, assuming that that's the one. I'm not understanding the warrant process. You say the girl disappears, you look at her computer to see who she's been corresponding with? Right. And so from the Internet identifier, you can tell who the Internet service provider  You've got to go there. Most Internet service providers are outside of California. The first step that you have to do is to find out who basically owns this account. You find out who owns the account, how they pay for it. The warrant to the service provider that you're talking about. Right. So you say, okay, this person owns this account. It could be just some wild person like Mickey Mouse or something, you're not really sure. So the next step is you need to figure out, okay, where is this computer, where was this computer when these communications were put into play? In other words, what's the IP address of this computer? That's another warrant if the Internet service provider doesn't have that. So that's warrant number two. Okay. Then you say, well, this person's computer is at this street address. And you say, okay, well, who is this person? And what are the contents of the communications? Warrant number three. At the end of the day, if you find out that it's a registered sex offender, you say, well, this computer belongs to Mr. Smith. We already have a file on him. We know where he is. We know what kind of car he drives. We know what he looks like. Let's go see if we can find him. Counsel, that was a very helpful explanation of what law enforcement could do with this information. Somehow I don't think I ever doubted that law enforcement could find useful and appropriate uses for the information. I think the problem that the district court had, I think the problem that we are going to have to answer is, you know, number one, is there chilling, which you haven't yet addressed? And two, is it narrowly tailored? We have some other problems here, I think, with overbreadth and vagueness that may or may not be before the court in terms of what people, you know, what people are going to have to report. But maybe you can get to the question of chilling and whether this is narrowly tailored. Okay. The reason that there's no real significant chilling and the reason why it's narrowly tailored is when you understand what it does, which is just provide a directory of information, you have to look at the case act itself. It's for tracking and preventing online sex crimes. The reason that this information was not disseminated wide to the public is because the public can make no real use of this information without being able to link it to the information that we have on where this person is and who this person is. Yeah. Only law enforcement can do that. You know, we're dealing in the post-Snowden era where we sometimes wonder whether all of our communications are being monitored by NSA. And we've got a little different situation here, but these are folks who are going to have to report all of their monikers that are used on the Internet and have no idea whether the police are sort of regularly trolling to monitor everything that they say on the Internet. Now, why isn't that why isn't that a chilling effect and why isn't that chilling speech that these folks may be entitled to make? The difference between the NSA situation and our situation is. Oh, I understand. Okay. So in our situation, then, the reason that there's no chilling effect is because it's just as improper for law enforcement as anybody else to be monitoring this non-criminal communications. There has to be a nexus between criminal activity and looking at this information and looking at this information. In the declaration of Robert Morgenstern, the DOJ expert, he said that law enforcement cannot monitor communications without a warrant. And also, the Court – I would ask the Court to please consider the fact that all private communications are still off limits to law enforcement because we don't have passwords. All content of communications are off limits to pass – to the law enforcement without a judicial approval warrant. The only thing that possibly could happen is if a registered sex offender is on a public website like Facebook that goes to the whole world and a law enforcement officer happens to recognize some odd Internet identifier, that's the only way that anybody could ever be monitoring anything of a registered sex offender. And that's why there can't be any chilling. Because if you look at the whole world of the Internet, it's all open to the registered sex offenders and nobody gets access to anything except those publicly available sites that the whole world can see. That's why there's no chilling. That's why there's no monitoring by law enforcement. Think about the fact that there's probably between 5,000 and 6,000 registrants in Los Angeles County alone. What's the probability that law enforcement, as scrapped as they are, are going to sit around and try to monitor some publicly available website belonging to a sex offender? It's just not going to happen. It has to do with the vagueness and overbreadth problems where it's very difficult to know how far the law extends. So if you open an eBay account, if you put something out on Craigslist, you want to put your bicycle out on Craigslist, are those things that they have to report? And it has to be done within 24 hours, or there are consequences? Thank you, Judge Biby. That's a good question, because kids are sold on Craigslist, too. It's impossible. There's no court that ---- Okay. So the answer from the State is, yes, you do have to report if you go on Craigslist. Yes. And here's the reason. At page 40 of Plaintiff's brief, they talk about how this thing could be structured. But when you walk through it, there's no possible way it could be drawn any narrower than it is right now. For example, tell us the websites. Let's limit it just to the websites. I'm getting close to my time, Your Honor. I'm only 20 seconds left. But tell us the websites that are only going to be used for preying on kids. And give us only the Internet identifiers that you're planning on using to prey on kids. These are not workable solutions. The narrowest that can be drawn, given the fluidity of the Internet, is to simply say, The district court below reached a narrowing conclusion that everybody agreed, at least we agreed with. The court found that it could be construed narrowly to avoid the vagueness issues and the overbreadth problem. As to too many people, as my colleague pointed out, states are not required to make individualized determinations of risk on registration issues, Smith v. Doe. As to too much speech, there's absolutely no possible way of writing a statute any more narrowly than we have right now that would allow us to at least have that location information. It's just a directory that allows law enforcement to know where somebody is. There's no way to draw this any narrower than we already have. And I think I'm out of time, Your Honor. Okay. Thank you. Good morning, Your Honors. Michael Richer with the ACLU of Northern California for the Plaintiffs and Appellees, and may it please the Court. A registrant who might want to criticize the local police department on his town's newspaper's website, but doesn't want to face retaliation, doesn't want the risk of retaliation, will be chilled knowing that his Internet identifier, the screen name he uses to do that, is down there at the police department, in his file and in the police department's database. The law allows the police access to that. The record shows that they make use of that access. That is the chilling effect. This is much greater than the chilling effect. In fact, the burdens in this case are much greater than those in cases like Lamont, Ward, certainly Lorillard Tobacco Company, all cases where the U.S. Supreme Court held that First Amendment scrutiny was warranted and applied it. First Amendment scrutiny is certainly warranted here with a statute that's backed up with criminal sanctions. I'd like to start my discussion by focusing, therefore, on the second part of the analysis, the narrow-tailoring analysis. What the rule is, the nature of the government's burden, because the government does have the burden to show narrow tailoring under Comittee and Turner, and finally, why the district court's factual findings demonstrate that the government has failed to meet its burden to show narrow tailoring. The test is the most relevant part for us of the test is easily stated. The government must show that the law does not burden substantially more speech than necessary. That requires the government to justify the scope of this law. Just as in Comittee, this Court held that a law that applied to an entire city regulating solicitation was geographically over-inclusive because the government had only shown that solicitation caused problems in certain parts of the city, so, too, here we have a law that applies to the entire net, to websites like the New York Times, the Los Angeles Times, Amazon, Craigslist, Yelp. Even if we assume that the government has sufficiently shown that chat rooms or gaming sites do pose some sort of risk that might merit this sort of law covering them, the district court specifically found that neither the government nor the intervenors had managed to show that other sites pose any reasonable risk of leading to an online sex offense or human trafficking. That's pages 16 and 17 of the record. That's a factual finding by the government's – excuse me, by the district court. It's totally justified under the facts of this case. It certainly is not clearly erroneous, and it justifies the Court's conclusion that the government had failed to meet its burden to show narrow tailoring because this law applies to not just a few marginal websites, but a hugely significant number of websites that are devoted to public discussion, not one-on-one chats, not something that could be used to entice a child, public discussion of social issues, political issues, other issues. Sotomayor, you're talking about the nature of the communications that are – that the sex offender might make that this identifier would relate to. Well, both the identifier and the ISP. The ISP requirements is what stands between. That's a burden on people's ability to get online, to engage in all sorts of speech. The identifier requirement is also a burden that burden under the – certainly under the intervener's interpretation of the law, essentially any online communication that involves any sort of screen name. So, yes. So it's both the service provider and the identifier that you're talking about. Because they both burden a registrant's ability to get on these websites the district court found do not pose any reasonable risk. We have the same situation with respect to the number of registrants covered by this, all 75,000. Many registrants pose no more risk of reoffending sexually than do people who have never been convicted of a sex offense. That's a finding from the district court. That's in the record Dr. Finkelhor's, Dr. Abbott's declaration, Professor Finkelhor's – excuse me, Dr. Hansen's and Dr. Abbott's declarations. Those include people who, like our clients, who were convicted long ago but have not been in trouble since then. It includes the 30 percent of people, registrants, who immediately upon their release are found by the State to pose a low risk of reoffending. It includes the 18,000 people, and this is on pages 139 and 141 of the record, whose crimes of conviction were not serious enough to merit inclusion on the government's Megan's Law website. Their name, nothing about them, shows up on the website. The district court specifically found, pages 15 and 16 of the record, that the government has the tools to distinguish between a subset of offenders who do pose a risk of reoffending and the government does have a legitimate interest in imposing this sort of restriction on them, not with respect to the thousands of Californians who do not pose a risk and certainly whom the government has not shown to pose a risk to satisfy its narrow tailoring requirements. That's a finding that the government could distinguish between these two groups. It's justified by the record. It's not clearly erroneous. It shows that this law is not narrowly tailored. It's also overbroad. Just two factual things that came up during counsel's argument. The increase of crimes on the net. Dr. Finkelhor, who studies this, puts that to rest. Page 421 of the record, 50 percent decline in unwanted sexual solicitations on the Internet between 2000 and 2010. Second of all, the start of this law. There was a 50 percent decline in unwanted sexual solicitation on the Internet between two reported cases of that between the year 2000 and the year 2010. This is not some recent explosion of solicitation on the Internet, quite the opposite. What accounts for that? Dr. Finkelhor discusses what possibly may account for it. People being more aware of the problem is certainly something he discusses. It's not entirely clear. Certainly the government hasn't shown the converse, and it has the burden. This law went into effect last November. Now, the government says that its form had been requesting Internet information before then. And that's true. So we have a form in the record. It's at page 0329 of the record. But that form simply asks for e-mail addresses and screen names slash social networks. It is not nearly as broad as the law we're looking at here. There's no indication that it was actually enforced. It's not in the statute until last November. That's really irrelevant to this case, whether the government got complaints about it. So I also would like to discuss, unless the Court has questions about narrow tailoring, the burdens involved here. These are significant burdens. First, what burdens – what sort of burden is needed? Well, no burden is actually necessary for us to show, because this is a law that directly targets speech. The words of the statute say that it targets Internet identifiers used for the purposes of communication. However, the burden here is much greater than other cases that have found burden. Lamont, the U.S. Supreme Court, looked at a law which simply required people who wanted to receive certain mail to send a letter to the post office. Justice Brennan's concurrence specifically notes that the government argued this is not an abridgment of the First Amendment. It's a mere inconvenience.   to receive certain mail to send a letter to the post office to be subject to First Amendment scrutiny and ultimately struck down that law. Ward simply required that bands in Central Park use the government's sound system. The Supreme Court specifically determined that did not affect the band's ability to express themselves in any way. Nonetheless, that burden, that restriction, that law that targeted speech was subject to intermediate scrutiny. It was narrowly tailored and, therefore, it passed that scrutiny. And finally, Lorillard Tobacco Company, the most recent case, a case that – where the State had passed a regulation to protect children from the dangers of tobacco, which the Supreme Court acknowledges the biggest public health threat to the United States at the time, the court of appeal had upheld this law, which simply required the tobacco advertisements in stores, certain stores that are within 1,000 feet of a park or playground or school, that the ads be 5 feet above the ground. So they couldn't be at a child's eye level. They had to be at an adult's eye level. The court of appeal, as the Supreme Court notes, had upheld that law on the grounds that it imposed only a minor restriction on First Amendment rights or a minor burden. The Supreme Court disagreed, held that First Amendment scrutiny was appropriate, broadly stated there is no de minimis exception to the narrow tailoring requirements, and then ultimately struck that law down. Those are burdens that the Supreme Court has held trigger First Amendment scrutiny. Let's look at what this case involves. A registrant has to go through this reporting requirement 24 hours after adopting a new ISP if he's traveling on business, a new screen name if he wants to make a comment on a website or something like that, get that information to the police either in person or by mail within 24 hours, or he can go to prison for a long time. Even if he makes every effort to comply with this law, he faces the risk that when he goes down to the police department for his annual update, the list that he brings with him of his ISPs and identifiers is not going to precisely match the one that the police department has. He gets arrested. Maybe he gets prosecuted. Or if he goes and he has this discussion with the police department that the government suggests he should have, and he says, you know, I did this online. I didn't think I had to adopt it. What do you think, officer? The officer says, well, I think you did have to adopt it. You're under arrest. You're maybe going to be prosecuted. Now, the government says, oh, that won't happen. Trust us. We're the government. We won't use this law irresponsibly. But, of course, Stevens rejects that argument. Comittee rejects that argument, the idea that the government can pass an overbroad law and simply say, oh, we'll not enforce it in ways that are going to chill the First Amendment. And I don't think any district attorney has ever lost a reelection or any prosecutor has ever been demoted for being too tough on sex offenders. The risk is there. The sanctions are great. That is going to have a chilling effect. There's also the impact on anonymous speech, and there are two impacts. Under Talley, under McIntyre, under Tucker, the Sheldon v. Tucker, one purpose of the First Amendment's protections for anonymous speech are to avoid official retaliation. As I said in the beginning, what registrant is going to want to make a comment on his local newspaper's website about the police department, a nasty comment, knowing that they have his identifier on file? It's very easy for a police officer to make a registration like this difficult. He can comb his registration file for a technical violation and arrest him for that. He can disseminate his name to neighbors. And then, second, there is a risk of dissemination of these names. The district court specifically found that that risk is a significant one and will have a chilling effect. The government's response is twofold. First, a factual one. They claim to have these procedures. The district court rejected that as a factual matter. Again, that's not clearly erroneous. We've never seen any policies. We've never seen any procedures. We simply have a vague description of them. On the law, the government points to a section of CalGER that, in fact, is dealing with Fourth Amendment protections for the home. The statute, 290.022, sub 4, specifically gives law enforcement full access to all registering information. 290.45 allows them to disseminate that to the public by any means they see fit, aside from the Internet, and as we discussed in our brief, they do that in quite a few circumstances because they believe it's need to protect a member of the public. Well, the sex offender registration laws have been challenged in a number of areas, I believe. And I'm not quite sure. I haven't done exhaustive research on them, but haven't most of the aspects of these laws been upheld, such as where the offenders live, whether they can be near certain institutions, and things like that? Many have been upheld, not all. In the record, California sex offender, California reform challenged one of these recently in Southern California and won. The challenges that have been rejected in the two Supreme Court Smith cases. What was that? What did that relate to? The one that, where it was the? You know, I'm not sure. They've actually been successfully, in two cases recently, one challenging requirements that on Halloween registrants close their door and turn their lights off, and another one that restricted their ability to go into parks and places like that. To be honest, I don't remember which one is in this record. The – but, of course, laws have been upheld against ex post facto and due process challenges, but using completely different standards. And the Seventh Circuit in Marion County addressed this exact issue. The government said, well, look, they've been upheld and other, other sex offender laws have been upheld. And the Seventh Circuit says, but those didn't involve the First Amendment. Marrion County doesn't seem really on point. I thought it was a much more aggressive law. Addoe v. Shurtleff seems like the one that may be closest to this case. Well, Marion County was a more aggressive law, but the Court's decision strikes it down not based on the fact that it was a total ban rather than a registration requirement, but on the fact that it just covered too much speech. Even though that one was much more closely directed only at certain websites, it wouldn't cover newspaper public comment sections, it said that's too much speech, because even on those websites, criminal speech is only an infinitesimal amount of the speech on those websites. The rest is protected based, and so it's overbroader or not narrowly tailored on that ground. The Shurtleff case involved a law that did not, that specifically prohibited dissemination in a way that 290.0224 and 290.45, not only do they not prohibit it, they allow it. Shurtleff is also flawed, because although it says narrow tailor or intermediate scrutiny applies, it never applies a narrow tailoring test. There's nothing in there about the scope of the websites covered. There's nothing in there about the government's ability to meet its burden, to distinguish between certain registrants and others. The only argument is that kidnappers shouldn't be covered. So if Shurtleff is, in fact, the closest case to this one out of the courts of appeals, I think that out of the court of appeal it may be. We have White out of Georgia and, of course, Dovey, Nebraska, also involve different laws, as does Dovey-Shurtleff. It's unpersuasive because it does not engage in the narrow tailoring analysis. It did not have, apparently, the evidence in front of it that this district court did when it made these factual findings about the overbreath, the lack of narrow tailoring here. Of course, I'm happy to address any questions the Court has about this. I'm sorry. So what should we say about Dovey-Shurtleff? That it involves a law that did not allow public dissemination, but more importantly, that Dovey-Shurtleff does not engage in the narrow tailoring analysis that Comite demands that this Court do. It simply did not allocate the burden to the government. It didn't discuss what websites were or were not covered. And, in fact, it's not clear to me which websites were covered in that case. So you want us to disagree with the Tenth Circuit? I don't think this Court needs to disagree. It is looking at a different law that creates a significantly greater chilling effect, both because of the risk of public dissemination and the additional burdens imposed because of the 24-hour reporting requirement. That was not an issue in Shurtleff. They don't have that sort of 24-hour reporting requirements. I believe that the numbers of websites covered by that law was less than this. But to be frank, I'm not entirely sure. That may also distinguish the law from this one. Was Proposition 35 initiated by the initial process or by the legislature? It was the proponents gathered signatures and put it on the ballot that way. And what group, major groups were backing Prop 35? I'm sorry? What major groups or organizations were backing 35, both financially and otherwise? I don't know. It may be that the proponents who are interveners here are in a better position to address that. I know that they've put information in the record about the nature of the proposition. I simply don't know. I apologize for that. Thank you. I don't think there are any other questions. Thank you, counsel. Thank you. I'm going to state you were over your time, but I am going to allow you a minute. I'm sorry. Did you have a concluding statement? I was simply going to close. Yes, please. You've got 45 seconds. In Long Island Tobacco, the Supreme Court recognized the urgency of the State's interest in protecting children. It nonetheless struck down the law. It doesn't mean that all tobacco laws, tobacco advertising laws are unconstitutional. That one was. Same situation here. We're not saying that the government couldn't pass one of these laws. Turner Broadcasting gives it a blueprint of how to pass a narrowly tailored one based on substantial evidence that doesn't apply to these websites that do not pose a risk of being used for criminal activity. That's not what we have here. We have an overbroad law. It's not narrowly tailored. The district court acted well within its discretion to issue a preliminary injunction to uphold the First Amendment rights of thousands of Californians. Do you agree that intermediate scrutiny? For the purposes of this appeal, we're arguing intermediate scrutiny. I do think that strict scrutiny is a more appropriate approach. But it doesn't matter. It's – I mean, Simon & Schuster takes the approach. We'll look at it under one, but it's also unconstitutional under the other. I'd urge this Court to take the same approach. Thank you very much. Thank you, Mr. Rasher. Mr. Wilson, I'm going to give you one minute. Thank you, Your Honor. The case does not directly attack speech. It's about conduct. It's about crimes against children. If the Court looks at the Broderick decision, it will see that there's a continuum between laws that address pure speech and ones that start heading towards conduct that the State has the criminal – the authority under the Penal Code statutes to enforce. That's the situation here in case. 290.45, which plaintiffs referred to, gives law enforcement broad authority to disseminate to the public. It doesn't. It's very narrow in terms of its ability to demonstrate – or to disseminate information. And there are penalties that go along with it and restrictions that go along with it as well. So it's not a situation in which law enforcement has this broad, unrestrained authority, as has been demonstrated by the history of collecting this information for all these years. One important thing about Doe v. Shurtleff is that the Court recognized that just – if only law enforcement has this information, that's not sufficient to create a chilling effect to strike down the statute. That's Doe v. Shurtleff. And the other part of Shurtleff that went unacknowledged is that that statute did not have limiting language in it, which says, for the purposes of tracking and preventing online sex crimes, that's what the Case Act has. So we are – we are completely different in that respect. Is Shurtleff the closest – the closest case for the State? Yes, Your Honor. Okay. Are there any others that you think support you that are close? Doe v. Shurtleff is the closest. As the Court acknowledged, all the other cases that we've seen across the country involve much more robust statutes, statutes that prevented them from accessing any kind of communication. Case doesn't do that. Statutes that wanted them to consent to monitoring and the installation of monitoring software. Case doesn't do that. There is nothing anywhere in the Internet that these folks can't speak to, just like they always have been. Case only gives law enforcement a directory so that if we need to dislocate somebody in a hurry, in a desperate situation, they can do it. We would submit on that, Your Honor, and respectfully request that the Court reverse the decision below on the preliminary injunction and remand it for further proceedings. Okay. Thank you. We thank counsel for the argument. It was well argued today. With that, the Court has completed the calendar for the day, and we stand in recess. Thank you.
judges: Timlin, Schroeder, Bybee